**RECEIVED**

APR 2 0 2010

OFFICE OF U.S. DISTRICT JUDGE
BRUCE S. JENKINS

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH
CENTRAL DIVISION

| | | |
|---|---|---|
| JACK WEBER, | ) | |
| | ) | |
| Plaintiff, | ) | C/A No. 2:09-CV-00712-BSJ |
| | ) | |
| v. | ) | ~~PROPOSED~~ ORDER |
| | ) | |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

Plaintiff Jack Weber filed suit seeking judicial review of the decision of the

Commissioner denying his application for disability insurance benefits (DIB) and supplemental

security income (SSI) under Titles II and XVI of the Social Security Act, respectively. *See*

42 U.S.C. §§ 401-33, 1381-1383f.[1] After careful review of the entire case record, the parties'

submissions, and arguments presented at a hearing held on April 13, 2010, the undersigned

concludes that the decision of the Commissioner should be **AFFIRMED**.

## PROCEDURAL HISTORY

Plaintiff applied for DIB and SSI pursuant to Titles II and XVI of the Act respectively on

April 4, 2005 (Tr. 554-56, 927-32). *See* 42 U.S.C. §§ 401-33, 1381-83f. He alleged disability

since October 17, 2000 (Tr. 554, 929) due to back and neck problems (Tr. 560, 595-600).[2] After

his applications were denied in initial and reconsidered determinations (Tr. 541-43, 545-47,

---

[1]All references to the U.S.C. (United States Code) are to the 2006 edition.

[2]Plaintiff originally alleged an onset date of October 17, 2000, but could not be found
(continued...)

933-34), he requested a hearing before an ALJ (Tr. 540). After a hearing on July 31, 2007, at which Plaintiff, his attorney, and a vocational expert were present (Tr. 935-79), the ALJ issued a decision on September 20, 2007, in which he found that Plaintiff was not disabled (Tr. 13-31). Plaintiff requested review of the ALJ's decision (Tr. 12). The Appeals Council denied Plaintiff's request (Tr. 7-9), making the ALJ's decision final for purposes of judicial review. *See* 20 C.F.R. § 404.981.[3]

## SUMMARY OF EVIDENCE

**(A)    Background.**

Plaintiff was 33 years old as of his amended alleged onset date and 36 years old as of the date of the ALJ's decision (Tr. 554, 929). He has a high school education (Tr. 566) and past work experience as a truck driver and mechanic (Tr. 561, 569-76, 585-94, 971).

**(B)    Medical Evidence Prior to Plaintiff's Amended Alleged Onset Date.**

Plaintiff's claims for DIB and SSI stem from an injury he sustained while on the job in May 1998. He was washing the windshield of a large truck while standing on the front tire. He slipped and fell under the truck, injuring his neck and back. Following his injury, he underwent treatment with medications (including narcotics, muscle relaxers, and anti-inflammatories) and

---

[2](…continued)
disabled prior to an Administrative Law Judge (ALJ) decision finding him not disabled on a prior application on November 4, 2004 (Tr. 32-48, 60-61, 63-65, 67-69, 75-77, 530-37). *See* 20 C.F.R. §§ 404.957(c)(1), 416.1457(c)(1), 404.981, 416.1481; *see also Fair v. Bowen*, 885 F.2d 597, 600 (9th Cir. 1989) (the doctrine of *res judicata* precludes a finding of disability prior to the date of denial of a claimant's previous application). Thus, Plaintiff amended his alleged onset date to November 5, 2004 (Tr. 938), one day after the prior unfavorable decision (Tr. 32-48).

[3]All references to the C.F.R. (Code of Federal Regulations), unless otherwise specified, are to the 2009 edition of part 404 of the regulations, which addresses claims under Title II of the Act. All of the cited regulations have parallel citations in part 416 of the regulations, which addresses claims under Title XVI of the Act.

physical therapy (Tr. 157-73, 181-82, 208-10, 215-16, 218-22, 228-34, 238-39, 246-47, 254, 256, 259, 261-64, 267-72, 274, 279, 290, 393-94, 396-97, 399-406, 408-09, 412-22, 429, 432, 434, 437, 442, 449, 453-54, 456, 491, 493-96, 503, 505-28, 613-18, 626-30, 640-43, 646-50, 655, 657, 689, 691, 694, 702, 704-06, 708, 711, 716, 723, 727-28, 730). Of note, a February 2001 cervical spine MRI study showed abnormal signal from the posterior half of the T1 vertebral body extending into the pedicle and posterior facet joint on the right (Tr. 259, 453, 727). In March 2001, a cervical spine CT scan showed a hemangioma within the T1 vertebral body (Tr. 169-70, 657). In June 2002, a cervical spine MRI study showed no significant interval change since the previous study in February 2001, but a high-intensity lesion occupying approximately 30 percent of the posterior and right lateral aspect of the T1 vertebral body possibly representing a hemangioma (Tr. 209, 437, 711). On March 10, 2004, a cervical spine MRI study showed a hemangioma on the right side of the T1 thoracic vertebral body, "stable since [May 20, 2002] and probably earlier" (Tr. 422, 691, 694).

On November 19, 2003, Mark Mitchell, M.D., stated that Plaintiff had a hematoma in his neck that caused chronic pain. He said it did not seem to be getting any better, but it did not seem to be getting any worse either. He stated Plaintiff's pain medications "seem[ed] to control it fairly well if he d[id not] do a lot of activities." He stated that, "at the current time, [Plaintiff was] not able to work at any rate" (Tr. 496). On March 18, 2004, George Hartle, a chiropractor, stated that Plaintiff had pain in his neck, shoulders, and left arm. He diagnosed cervical disc syndrome (from irritation by a tumor), cervical spine radiculopathy, muscle spasms and swelling. He noted he treated Plaintiff with conservative care, but any activities of daily living exacerbated his condition. He stated Plaintiff would be "disabled throughout his life due to the tumor in his

cervical spine." He also stated that he needed treatment to help his quality of life (Tr. 491). That same day, Dr. Mitchell, completed a form for the Department of Workforce Services wherein he stated that Plaintiff could do "limited sedentary" work. He stated that Plaintiff could work "less than full time" for approximately "0 Hours/Day," but his condition should be reviewed again in eight weeks. He stated that Plaintiff experienced pain with long sitting or standing (Tr. 493-95).

**(C)   Medical Evidence After Plaintiff's Amended Alleged Onset Date.**

Treatment Records and Opinions of Dr. Mitchell. Following Plaintiff's amended alleged onset date, he saw Dr. Mitchell through at least April 2005 (Tr. 631-39, 653, 685). On November 18, 2004, Dr. Mitchell found that he had a flat affect. He diagnosed neck pain and depression and prescribed OxyContin (a narcotic) and Cymbalta (an antidepressant) (Tr. 639). On December 16, 2004, Dr. Mitchell diagnosed chronic low back pain. He refilled Plaintiff's prescriptions and stated there were "restrictions on him as far as no bending or stooping" and needing to lie down (Tr. 638). On January 6, 2005, Plaintiff told Dr. Mitchell he was "suffering because his OxyContin pills were allegedly stolen." Dr. Mitchell found that he had tenderness in his neck. He did not want to try an injection because of "a bad experience with injection[s] before." Dr. Mitchell diagnosed neck pain. He administered a Toradol (an anti-inflammatory) injection and prescribed Bextra (an anti-inflammatory) (Tr. 636). On January 18, 2005, Plaintiff reported he was "doing okay." Dr. Mitchell noted he was in "no acute distress" and diagnosed chronic neck pain. He prescribed OxyContin (Tr. 635).

On February 18, 2005, Dr. Mitchell recommended a cervical spine MRI study (Tr. 634), which showed stable appearance of his T1 vertebral body lesion extending into the pedicle and lamina. Vineet Sharma, M.D., stated that the study showed findings compatible with a vertebral

cavernous hemangioma and, given the avid enhancement and pedicular and laminar extension, the hemangioma exhibited aggressive features and could account for Plaintiff's pain symptoms (Tr. 653, 685). On February 25, 2005, Dr. Mitchell stated that "the last reading of his MRI show[ed] that he had a hemangioma, it look[ed] like it [was] aggressive and could be the cause of his pain." He diagnosed chronic upper back pain. He stated that Plaintiff "need[ed] cross training" and was "not able to work according to his current level of experience at all" (Tr. 633). On March 7, 2005, Dr. Mitchell noted that Plaintiff "appear[ed] to be doing alright" (Tr. 632). On April 15, 2005, he diagnosed chronic neck pain and prescribed OxyContin (Tr. 631).

     <u>Treatment Records and Opinions of Kashif Memon, M.D.</u> The medical evidence after Plaintiff's amended alleged onset date showed treatment by Dr. Memon between May 2005 and May 2007 (Tr. 663-65, 671, 901-04, 908-09). On May 16, 2005, he presented to Dr. Memon with complaints of low neck and right arm pain. He also complained of numbness in his right arm and hand. He reported that his depression was "mild." Upon examination, Dr. Memon found that he had full strength in all of his extremities, diminished reflexes, and slightly decreased sensation at the extensor and flexor surfaces of the right forearm and hand. He diagnosed type II diabetes, hypertension, dyspepsia, hemangioma of the thoracic spine, depression, insomnia, and migraine headaches. He prescribed medications, including Lortab (a narcotic). Plaintiff stated that he did not want any antidepressant medications at that time (Tr. 665). On June 16, 2005, Plaintiff told Dr. Memon that he had no improvement in his pain with Lortab or Panlor (a synthetic opioid) and was "unable to do anything." Dr. Memon diagnosed type II diabetes, spinal hemangioma with back pain, dyspepsia, and hypertension and prescribed medications, including Lortab. On July 14, 2005, he diagnosed spinal hemangioma

with back pain "stable on current regimen," dyspepsia, type II diabetes, and hypertension. He prescribed medications, including Lortab (Tr. 664).

On August 15, 2005, Plaintiff reported to Dr. Memon that his pain was controlled with Lortab. He reported that he still had significant limitation in all kinds of movement and significant paresthesias in his right hand, problems with gait, dizziness, fatigue, mood swings, anxiety, and depression. Dr. Memon found that Plaintiff had midline tenderness in his upper back. He diagnosed spinal hemangioma with back and neck pain, type II diabetes, dyspepsia, hypertension, and asthma. He prescribed medications, including Lortab, and stated he "[did not] think [Plaintiff was] able to work at the present time and his disease which [was] inoperable [was] likely to progress" (Tr. 663). He identified Plaintiff's symptoms as pain in his back, neck, and right shoulder, paresthesias of the right hand, fatigue, and dizziness. He stated that Plaintiff's symptoms were severe enough to interfere with his attention and concentration frequently. He stated that Plaintiff could only walk one block and had to lie down or recline for eight hours in a workday. He stated Plaintiff could sit and stand/walk for 20 minutes each at one time and two hours each in an eight-hour day. He stated that Plaintiff could not work. He said he could only occasionally lift and carry less than ten pounds and was limited to using his hands, fingers, and arms for 10-15 percent of an eight-hour day. He stated Plaintiff could stoop and crouch five percent of an eight-hour workday, would miss work more than four times per month, and had limitations due to post-traumatic stress disorder (PTSD), anxiety, depression, and panic attacks (Tr. 667-68). He stated that Plaintiff's diabetes resulted in neuropathy and significant and persistent disorganization of motor function in two extremities (Tr. 670). He stated

Plaintiff's hemangioma resulted in compromise of a nerve root, neuroanatomic distribution of pain, limited range of motion of the spine, and motor, sensory, and reflex loss (Tr. 671).

On October 20, 2005, Dr. Memon diagnosed spinal hemangioma with chronic back pain "stable on current regimen" and prescribed Lortab (Tr. 908). On December 1, 2005, Plaintiff reported to Dr. Memon that he was stable and denied any acute complaints. Dr. Memon diagnosed spinal hemangioma with chronic back pain, degenerative joint disease, and peripheral neuropathy "stable on current regimen" and continued Plaintiff's medications (Tr. 908). On January 19, 2006, Plaintiff saw Dr. Memon with complaints of a migraine headache and numbness in both arms. Dr. Memon found that Plaintiff had midline cervical tenderness. He diagnosed spinal hemangioma with worsening paresthesias, type II diabetes, hypertension, and dyspepsia. He prescribed medications, including Lortab (Tr. 904).

On March 16, 2006, Plaintiff complained to Dr. Memon of sharp pain in his left heel. Dr. Memon found no extremity edema but tenderness at the right heel region more laterally. He diagnosed probable plantar fasciitis, type II diabetes, hypertension, dyspepsia, and spinal hemangioma and prescribed medications, including Lortab (Tr. 903). On May 9, 2006, Plaintiff complained to Dr. Memon of sinusitis. Dr. Memon diagnosed acute sinusitis, hypertension, type II diabetes, and spinal hemangioma. He noted that Plaintiff's spinal pain was stable with Lortab and continued his medications (Tr. 901). Plaintiff did not see Dr. Memon again until May 16, 2007, when he presented after "being fired" by another provider. He said his pain was "occasionally worse" and he took an extra Lortab. He also reported his hemangioma had been stable. Dr. Memon found he was in no acute distress and was alert/oriented times three, but appeared tired (Tr. 902).

Treatment Records of Michael Catten, M.D. The medical evidence after Plaintiff's amended alleged onset date showed that he underwent treatment by Dr. Catten between January 2006 and May 2007. In January 2006, a neck MRI study ordered by Dr. Catten showed a stable hemangioma at T1, reversed lordosis, and mild desiccation of one or two discs (Tr. 851). Brain MRI studies ordered by Dr. Catten were essentially negative (Tr. 852-53). On February 14, 2007, Plaintiff saw Dr. Catten with complaints of worsening audiogram and sinus infection. Dr. Catten diagnosed acute sinus disease and progressive sensorineural hearing loss and prescribed antibiotics and tapered Prednisone (a steroid) (Tr. 926). On March 21, 2007, Dr. Catten recommended surgery for Plaintiff's sinus problems (Tr. 921). On April 2, 2007, he underwent bilateral endoscopic maxillary antrostomies with tissue removal and endoscopic total ethmoidectomy (Tr. 831-32). On May 4, 2007, Plaintiff saw Dr. Catten for follow-up to Ménière's disease and sinus problems. Dr. Catten prescribed Dyazide (a diuretic) (Tr. 920).

Treatment Records from Kent Worthen, D.O. Medical evidence after Plaintiff's amended alleged onset date showed that Dr. Worthen treated him from January to October 2005 (Tr. 765-66, 770-72, 776-77, 788-89, 793-96, 830). On January 28, 2005, Plaintiff told Dr. Worthen that, during the day he took care of his children and went to the store at night when there were fewer people. He said he was very compliant with psychotherapy except for missing two appointments without notice. He reported taking no antidepressant medications. Dr. Worthen found that Plaintiff had appropriate hygiene and grooming. He did not appear to be in any distress and had logical, goal-directed, and fluent speech. There was evidence of irritability, anxiety, and stress. He appeared to have average intelligence. Plaintiff stated that there were nerve endings in his hemangioma and felt that the growth of his hemangioma

accounted for his pain and prevented him from working. Dr. Worthen diagnosed pain disorder associated with psychological factors and a general medical condition, and anxiety, depressive, and personality disorders not otherwise specified. He prescribed Cymbalta and recommended psychotherapy (Tr. 793-96).

On March 8, 2005, Plaintiff saw Dr. Worthen again, who noted that Plaintiff's cervical spine MRI study showed a stable venous cavernous hemangioma and in the impression, under subjective impressions, "i.e., CAN it stated that it could be aggressive and account for [Plaintiff's] pain." Dr. Worthen stated that "[i]t was this idea that the hemangioma may be aggressive and account for [his] pain that [Plaintiff] focuse[d] on." Dr. Worthen found that he was alert and somewhat worried. Dr. Worthen's diagnosis was unchanged and he recommended meeting with Workforce Services, Vocational Rehabilitation, Plaintiff's therapist, and Plaintiff's primary care provider to go over his treatment plans and goals (Tr. 776-77).

On April 8, 2005, Plaintiff told Dr. Worthen that he took Cymbalta. Dr. Worthen found he was alert and in no distress. He found that Plaintiff's speech was logical and his mood was mildly irritated. Dr. Worthen observed that Plaintiff walked fluidly and did not seem to be in pain. His diagnoses were unchanged (Tr. 772). On May 10, 2005, Plaintiff returned to Dr. Worthen, reporting that he stopped taking Cymbalta two weeks earlier because it made him tired. He stated that he did not feel that he needed an antidepressant. Dr. Worthen found that Plaintiff was alert and in no distress. He was somewhat irritable and had logical speech and mildly depressed mood. Dr. Worthen's diagnoses were unchanged (Tr. 770-71).

On July 22, 2005, Plaintiff told Dr. Worthen that his mood, for the most part, was fairly stable. He said that he got irritable occasionally and experienced nightmares. Dr. Worthen

found that he was alert and in no distress. He had logical speech, neutral mood, and mild anxiety. Dr. Worthen's diagnoses were unchanged and he continued Plaintiff's medications (Tr. 765-66). On July 27, 2005, Dr. Worthen completed a Mental Capacity Assessment form wherein he checked boxes indicating that Plaintiff had marked limitations on his abilities to maintain attention and concentration for extended periods, perform at a consistent pace with a standard number and length of rest periods, and accept instructions and respond to criticism from supervisors. He checked a box stating that Plaintiff would miss more than three days of work per month. He also checked boxes stating that Plaintiff had marked limitations on his abilities to work in coordination with or in proximity to others without being distracted by them, complete a normal workday and workweek without interruptions from psychologically based symptoms, and interact appropriately with the general public, each followed by a question mark (Tr. 824-26).

He also completed a form wherein he checked boxes indicating that Plaintiff had anhedonia, sleep disturbance, psychomotor agitation or retardation, decreased energy, feelings of guilt or worthlessness, difficulty concentrating or thinking, and thoughts of suicide. He checked boxes indicating that Plaintiff had moderate restrictions of activities of daily living and marked limitations in social functioning, concentration, persistence, and pace, again writing question marks to the side of each box. He said that Plaintiff had a residual disease process resulting in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause him to decompensate (Tr. 828-29). He completed a form wherein he checked boxes stating that Plaintiff had generalized persistent anxiety with motor tension, apprehensive expectation, and autonomic hyperactivity (with a question mark written to the side). He said Plaintiff had recurrent severe panic attacks manifested by a sudden

unpredictable onset of intense apprehension, fear, terror, and sense of impending doom occurring on the average of at least once a week, and recurrent and intrusive recollections of a traumatic experience, which were a source of marked distress (Tr. 830).

On October 18, 2005, Dr. Worthen noted that, when sitting, Plaintiff did not fidget and walked at a slow and easy pace. He noted that Plaintiff was always calm and polite, but expressed his frustrations with life. Plaintiff reported that he did not handle stress well, but in the past had always been able to manage the difficulties he faced. He stated that, when under stress, he struggled with anger. He had a good long-term memory, but reported struggling with short term memory. Dr. Worthen noted that, when given time in a session, Plaintiff was usually able to recall most things. Plaintiff reported difficulty concentrating and often became frustrated. He reported that his depression was primarily due to limitations from his medical condition and chronic pain. He reported difficulty sleeping, low motivation, isolation, rumination, and blunted affect. He also reported anxiety as a result of flash-backs to his accident and discomfort with being in public. He reported his daily activities centered around caring for his children and stepdaughter. He said that he collected baseball cards and enjoyed fishing. Dr. Worthen diagnosed major depression, PTSD, and "consider somatization disorder." He stated that Plaintiff's mental health symptoms were almost completely related to his medical condition. He said that Plaintiff "manage[d] his depression well most of the time" (Tr. 788-89).

Records from Northeastern Counseling Center. The medical evidence showed that, after his amended alleged onset date, Plaintiff underwent psychotherapy at the Northeastern Counseling Center from November 2004 to May 2007 (Tr. 751-58, 760-71, 773-79, 783-87,

854-98). Of note, Ezekiel Burnett, a social worker, routinely found that Plaintiff had a normal mental status examination (Tr. 751-52, 754-56, 758, 760, 764-70, 773-78, 858-61, 863-66, 869-98). Plaintiff also missed approximately eleven appointments with Mr. Burnett without explanation (Tr. 751, 755, 778, 871, 873, 890, 896).

Reports of the State Agency Physicians and Psychologists. On July 6, 2005, Lewis Barton, M.D., a State agency physician, reviewed the medical evidence and found that Plaintiff could perform medium work (Tr. 814-21). On January 2, 2006, Nancy Cohn, Ph.D., a State agency psychologist, reviewed the medical evidence and found that Plaintiff had an affective disorder, anxiety-related disorder, and personality disorder on a rule-out basis resulting in mild restrictions of activities of daily living, social functioning, concentration, persistence, and pace and no episodes of decompensation. Therefore, she found that Plaintiff did not have a severe mental impairment and could do simple or even more complex work (Tr. 798-811). On January 5, 2006, D. Witbeck, M.D., a State agency physician, reviewed the medical evidence and affirmed Dr. Barton's July 2005 findings (Tr. 821).

**(D)   Plaintiff's Hearing Testimony.**

Plaintiff testified that, from November 2004 to the end of that year, he could sit about 20-30 minutes at a time, stand about 15-20 minutes at a time, walk about 30 minutes at a time, and lift a gallon of milk, but was unsure of how long he could sit, stand, or walk in an eight-hour day (Tr. 942-44). He testified that he had to lie down at least one-half to two hours total during the day, usually having to lie down for at least 30 minutes to get some relief. He rated his pain as a 6-7/10 from his amended alleged onset date to the end of 2004 (Tr. 944). In 2005, Plaintiff testified that he had the same problems with constant aching in his mid-neck area. To help

relieve this, he would periodically put ice packs or heat on it, lie down, or recline (Tr. 946). He said that OxyContin helped with the pain, but he felt he was getting addicted to it (Tr. 947). He said he took two Lortab in the morning, two in the evening, and at times, one between on bad pain days without side effects (Tr. 947-48). He alleged pain levels between six and eight in 2005 (Tr. 948). In 2005, he said his live-in girlfriend would help with lifting, cooking, and spot cleaning (Tr. 949). He stated that during that year, he could care for his personal needs (Tr. 949-50) and spent his time listening to music and watching television, including two movies per day. He said his most comfortable position was lying down or fully reclining (Tr. 950). He said he alternated throughout the day with sitting, standing, and walking (Tr. 951).

The Sunday before the hearing, Plaintiff testified that he got up and ready for the day. At 1:00 PM, he went to the park to supervise visitation of his children with their mother for one hour with sitting, standing, or walking every 15 minutes or so (Tr. 952-53). He then returned home and watched his children play (Tr. 953-54). He then left his hometown of Roosevelt to drive to Salt Lake City, driving for approximately 30 minutes before becoming uncomfortable (Tr. 954). Due to hand numbness, his wife drove the rest of the way, and they took breaks, some after only 20 minutes or so of driving, others after 45-60 minutes. During the breaks, he would walk around (Tr. 955-56). When he arrived in Salt Lake, he went to a friend's house to lie down on the couch. At the end of the day, his pain levels were an eight to nine. He took five Lortabs on that day, two in the morning, one mid-day, and two in the evening (Tr. 956-57). On the day before the hearing, Plaintiff testified he was at a friend's house most of the day, playing cards and resting on the couch, with pain levels of eight to nine. He said that he would have to have a one to two level of pain to be able to work (Tr. 958-59). He testified that he had engaged in

-13-

several hours of childcare, as his wife would be either working or unavailable (Tr. 963). He

noted that his sister came over periodically to help out as well. He felt that, on a good day, he

could have gotten by without her help, such as making lunches and things like that (Tr. 963-64).

He stated his hearing was okay with hearing aids and not a concern with regard to work (Tr.

962). He testified that, since his amended alleged onset date, 60 percent of his days had been

bad (Tr. 964, 966). He said that excessive absences and the need to lie down would have

prevented him from performing any work during the relevant time period and he had not looked

for work for those reasons (Tr. 966-67, 969). At the end of the hearing, he said that his pain was

a 7-8/10 (Tr. 969).

**(E)** **Vocational Expert Testimony.**

The ALJ asked Dina Galli, a vocational expert, to assume a hypothetical individual, of

Plaintiff's age, education, and work experience, who was limited to sedentary unskilled work

with the following limitations:

> [T]he lifting would be limited from 10 pounds down to about 8 and a half pounds
> or a gallon of fluid, at a time he would use both hands to do this safely but would
> use the left hand primarily. [Plaintiff] is right handed, and he has right-hand
> numbness so we cannot have any jobs that require feeling in the right hand.
> Reaching, handling, and fingering would be okay for this first hypothetical but not
> feeling. So it's a full range of sedentary otherwise except that he could have no
> overhead lifting or reaching duties on the job. Nonexertionally because of the pain
> and the mental limitations, he would be at the low stress level of work, which means
> a low production rate type of a job, essentially no working with the general public,
> only minimal contact with supervisors and coworkers on the job, but he still would
> have the ability to respond appropriately to supervision, coworkers, and the work
> situations. And he would also have the ability to deal with changes in the routine
> work setting but only minimal changes in the work setting. His concentration level
> would be low, which basically means the ability to be alert and attentive to and also
> to perform unskilled work tasks. Pain and mental abilities can affect the memory as
> well, so he would have the ability to understand, remember, and carry out simple
> instructions utilizing GED levels of at least reasoning two to three, math one to two,
> and language one to two. He would also have the ability to use appropriate

judgment in making simple, work-related decisions and have only minimal changes in the work instructions from week to week. His neck is a problem, and I put down no significant activity with the neck, such as a driving job because he's turning around and checking rearview mirrors and things like that.

(Tr. 971-72). Ms. Galli testified that such an individual could perform the jobs of semi-conductor bonder (40,000 jobs in the national economy) and dowel inspector (20,000 jobs in the national economy). She testified that she would make a 20 percent reduction in the numbers of these jobs in light of the hypothetical question. She testified that the person could also perform the job of addresser (40,000 jobs in the national economy), and make the same 20 percent reduction. The ALJ then asked Ms. Galli to also consider that the hypothetical person had an additional limitation to only occasional reaching, handling, and fingering with the right upper extremity. She testified she would make an additional 20 percent reduction to the number of dowel inspector and semi-conductor bonder jobs and eliminate any addresser jobs (Tr. 973-74). She testified that, if the GED language level in the hypothetical question was raised to 3, the hypothetical person could perform the job of surveillance systems monitor (40,000 jobs in the national economy), which she would reduce by 50 percent (Tr. 974). The ALJ asked her to also consider a sit/stand option. Ms. Galli testified that this limitation would not affect any of the jobs listed. She said that the reductions made in the dowel inspector jobs accommodated any limitations on reaching and handling. She testified this was based on the fact that the U.S. Dep't of Labor, *Dictionary of Occupational Titles* (4th ed. 1991), classified jobs according to their maximums and not according to the range of particular jobs across the industry. She also believed that, with the reductions she made, which she based on observing those jobs, surveying those jobs, and talking to employers, the remaining jobs could be performed (Tr. 975). She said the same was true for the sit/stand option (Tr. 976).

# DISCUSSION

## (A)    Legal Standard.

Under the Social Security Act, "disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). The Act further provides that an individual shall be determined to be disabled "only if his physical or mental impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful activity which exists in the national economy." 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

A person seeking Social Security benefits bears the burden of proving that because of his disability, he is unable to perform her prior work activity. *See Miller v. Chater*, 99 F.3d 972, 975 (10th Cir. 1996); *Nielson v. Sullivan*, 992 F.2d 1118, 1120 (10th Cir. 1993). Once the claimant establishes that she cannot perform his past relevant work, the burden shifts to the Commissioner to prove that the claimant retains the ability to do other work and that jobs which he can perform exist in the national economy. *See Saleem v. Chater*, 86 F.3d 176, 178 (10th Cir. 1996); *Miller*, 99 F.3d at 975.

The Commissioner's decision must be supported by substantial evidence. *See Daniels v. Apfel*, 154 F.3d 1129, 1132 (10th Cir. 1998); *Hinkle v. Apfel*, 132 F.3d 1349, 1351 (10th Cir. 1997). "Substantial evidence" means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). The

Commissioner's findings of fact, if supported by substantial evidence, are conclusive upon judicial review. *See* 42 U.S.C. §§ 405(g), 1383(c)(3); *Perales*, 402 U.S. at 390. In reviewing the Commissioner's decision, the Court may not re-weigh the evidence or substitute its judgment for that of the agency. *See Hinkle*, 132 F.3d at 1351; *Decker v. Chater*, 86 F.3d 953, 954 (10th Cir. 1996). The Court also reviews the Commissioner's decision to determine whether the correct legal standards were applied. *See Daniels*, 154 F.3d at 1132; *Hinkle*, 132 F.3d at 1351.

The Commissioner has established the following five-step process for determining whether a person is disabled:

(1)     A person who is working is not disabled. *See* 20 C.F.R. § 404.1520(b).

(2)     A person who does not have an impairment or combination or impairments severe enough to limit her ability to do basic work activities is not disabled. *See id* § 404.1520(c).

(3)     A person whose impairment meets or equals one of the impairments listed in the "Listing of Impairments," 20 C.F.R. pt. 404, subpt. P, app. 1, is conclusively presumed to be disabled. *See id* § 404.1520(d).

(4)     A person who is able to perform work he has done in the past is not disabled. *See id.* § 404.1520(e).

(5)     A person whose impairment precludes performance of past work is disabled unless the Commissioner demonstrates that the person can perform other work available in the national economy. Factors to be considered are age, education, past work experience, and residual functional capacity. *See id.* § 404.1520(f).

**(B)     The ALJ's Decision.**

In his decision, the ALJ applied the familiar five-step sequential evaluation mandated by the Commissioner's regulations for determining disability. At step one, he found that Plaintiff had not engaged in substantial gainful activity since his amended alleged onset date (Tr. 18). At

-17-

step two, he found that Plaintiff had a hemangioma of the spine, affective/mood disorder, and an anxiety disorder, impairments that were "severe" within the meaning of the regulations (Tr. 18-19). *Id.* at § 404.1520(c) (an impairment is "severe" if it "significantly limits [an individual's] physical or mental abilities to do basic work activities."); *see also Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987); Social Security Ruling (SSR) 85-28; SSR 96-3p. At step three, he found that Plaintiff did not have an impairment or combination of impairments that satisfied the criteria of the Listing of Impairments found at 20 C.F.R. pt. 404, subpt. P, app. 1 (the Listings) (Tr. 19-20). The ALJ found that Plaintiff's subjective complaints regarding the severity of his symptoms were not fully persuasive (Tr. 25). He found that Plaintiff had the residual functional capacity to perform sedentary, unskilled work that did not require:

- Lifting more than 8.5 pounds at a time with both hands; however, primarily with the left hand;
- Sitting, standing or walking more than 15-20 minutes at a time (the sit/stand option);
- More than occasional handling, reaching, and fingering with the right upper extremity due to right-hand numbness (no feeling);
- Significant overhead lifting or reaching;
- Work at more than a low stress level, which means:
  - A low production rate;
  - Essentially no working with the general public;
  - Only minimal contact with supervisors and co-workers on the job but still having the ability to respond appropriately to supervision, co-workers and work situations;
  - The ability to deal with minimal changes in a routine work setting;
- Work at more than a low concentration level, which means the ability to be alert and attentive to (and to perform) unskilled work tasks; and,
- Work at more than a low memory level, which means:
  - The ability to understand, remember and carry out simple instructions, utilizing GED levels of at least Reasoning 2-3, Math 1-2, and Language 1-3;
  - The ability to use appropriate judgment in making simple work-related decisions;
  - Minimal changes in the work instructions from week to week.
- Other limitations, including no significant work duties involving use of the neck, such as driving.

(Tr. 20-29). At step four, he found that Plaintiff was unable to perform his past relevant work (Tr. 29). At step five, relying on vocational expert testimony, the ALJ found that Plaintiff could perform other work existing in significant numbers in the national economy. Specifically, he found that Plaintiff could perform the jobs of surveillance systems monitor, dowel inspector, and semi-conductor bonder (Tr. 29-30). Therefore, the ALJ found that Plaintiff was not disabled (Tr. 30-31).

Plaintiff makes two principal arguments in support of his disability claim: (1) the ALJ erred by failing to properly evaluate his credibility (Pl.'s Br. at 8-12); and (2) failing to properly evaluate the opinions of his treating physicians (Pl.'s Br. at 12-16). For the reasons discussed below, the undersigned finds that Plaintiff's arguments are without merit. The ALJ's decision is supported by substantial evidence and free of legal error. Therefore, the undersigned hereby **AFFIRMS** that decision. The undersigned addresses each of Plaintiff's arguments in turn.

**(B)** **Plaintiff's Credibility.**

An ALJ must provide specific, legitimate reasons for his credibility findings. *See Kepler v. Chater*, 68 F.3d 387, 391 (10th Cir. 1995). However, a "formalistic factor-by-factor recitation of the evidence" is not required. *See Qualls v. Apfel*, 206 F.3d 1368, 1372 (10th Cir. 2000). To be upheld by a reviewing court, an ALJ need only set forth the specific evidence he relies on in evaluating a claimant's credibility. *See id.* Because the ALJ was in the best position to observe the demeanor of witnesses, his credibility findings deserve special deference. *See Lax v. Astrue*, 489 F.3d 1080, 1089 (10th Cir. 2007). Plaintiff argues that the ALJ erred by improperly evaluating his credibility.

However, as the ALJ found, Plaintiff's subjective complaints were inconsistent with the objective medical evidence (Tr. 22-26). The findings of Drs. Mitchell, Memon, Worthen, and Catten were inconsistent with the degree of physical symptomology and limitation that Plaintiff alleged. In January 2005, Dr. Mitchell noted that Plaintiff was "doing okay" and in no acute distress (Tr. 635). In February 2005, a cervical spine MRI study ordered by Dr. Mitchell showed "stable" appearance of his T1 vertebral body lesion (Tr. 634, 653, 685). In March 2005, Dr. Mitchell noted that Plaintiff "appear[ed] to be doing alright" (Tr. 632). In April 2005, Dr. Worthen noted that Plaintiff "walked fluidly" and did not seem to be in any pain (Tr. 772). In May 2005, Dr. Memon found that Plaintiff had full strength in all his extremities, diminished reflexes, and only "slightly" decreased sensation at the extensor and flexor surfaces of the right forearm and hand (Tr. 665). The following month, Dr. Memon described Plaintiff's spinal hemangioma with back pain as "stable on [his] current regimen" (Tr. 664). In December 2005, Dr. Memon noted that Plaintiff was stable and he denied any acute complaints. Dr. Memon described his spinal hemangioma with chronic pain, degenerative joint disease, and peripheral neuropathy as "stable on [his] current regimen" (Tr. 908). In January 2006, a neck MRI study showed a stable hemangioma at T1, reversed lordosis, and only "mild" desiccation of one or two discs (Tr. 851). In May 2006, Dr. Memon described Plaintiff's pain as "stable" (Tr. 901). In May 2007, he noted that Plaintiff's pain was only "occasionally worse" and his hemangioma had been stable (Tr. 902). *See Huston v. Bowen*, 838 F.2d 1125, 1132 (10th Cir. 1988) (The consistency or compatibility of nonmedical testimony with objective medical evidence may be considered in evaluating credibility); *Talley v. Sullivan*, 908 F.2d 585, 587 (10th Cir. 1990)

(stating that medical records must be consistent with nonmedical testimony as to the severity of a claimant's symptoms).

Likewise, the findings of Dr. Worthen and Mr. Burnett were inconsistent with the degree of mental symptomology and limitation that Plaintiff alleged. In January 2005, Dr. Worthen noted that Plaintiff had appropriate hygiene and grooming. He noted that, while Plaintiff demonstrated irritability, anxiety, and stress, he did not appear to be in any distress and had average intelligence and logical, goal-directed, and fluent speech (Tr. 793-96). In March 2005, Dr. Worthen noted that Plaintiff was alert and only "somewhat" worried (Tr. 776-77). In April 2005, Dr. Worthen noted that Plaintiff was alert and in no distress. He had logical speech and only "mildly" irritated mood (Tr. 772). In May 2005, Dr. Worthen found that Plaintiff was alert and in no distress. He was only "somewhat" irritable and had logical speech and only "mildly" depressed mood (Tr. 770-71). In July 2005, Dr. Worthen found that Plaintiff had logical speech, neutral mood, and only "mild" anxiety (Tr. 765-66). In October 2005, he noted that Plaintiff was "calm" and "polite." He also noted that Plaintiff had good long-term memory and was able to recall most things. He stated that Plaintiff "manage[d] his depression well most of the time" (Tr. 788-89). Between November 2004 and May 2007, Mr. Burnett routinely found that Plaintiff had a normal mental status examination (Tr. 751-52, 754-56, 758, 760, 764-70, 774-78, 858-61, 863-66, 869-98). See id.

Plaintiff argues that, in finding his subjective complaints out of proportion to the objective medical findings (Tr. 26), the ALJ substituted his own judgment for the opinion of a doctor when he said "The statement '. . . this hemangioma exhibits aggressive features, and can account for [Plaintiff's] pain symptoms' was made in the context of a subjective impression and

-21-

[was] highly equivocal" (Pl.'s Br. at 10-11). However, the ALJ's statement was supported by the medical evidence, including the statements of Dr. Sharma himself as well as the statements of Drs. Mitchell and Worthen. In February 2005, Dr. Sharma stated that a cervical spine MRI study showed a hemangioma that "exhibit[ed] aggressive features" and "[*could*] account for [Plaintiff's] pain symptoms" (Tr. 653, 685) (emphasis added). That same month, Dr. Mitchell noted that the hemangioma "*look[ed] like* it [was] aggressive and *could* be the cause of his pain" (Tr. 633) (emphasis added). In March 2005, Dr. Worthen stated that this study showed a "stable venous cavernous hemangioma and in the impression, *under subjective impressions*, i.e., CAN it states that it *could* be aggressive and account for [Plaintiff's] pain." Dr. Worth stated that "[i]t was this idea that the hemangioma *may be* aggressive and account for [his] pain *that [Plaintiff] focuse[d] on*" (Tr. 776-77) (emphasis added). For these reasons, the Court rejects Plaintiff's argument.

As the ALJ also found, evidence that medications and other treatment mitigated Plaintiff's symptoms also undermined his subjective complaints. In August 2005, Plaintiff told Dr. Memon that his pain was controlled with Lortab (Tr. 663). In May 2006, Dr. Memon noted that Plaintiff's spinal pain was stable with Lortab (Tr. 901). *See Huston*, 838 F.2d at 1132 (medications and their effectiveness may be considered in assessing credibility). As the ALJ found, gaps in treatment for Plaintiff's allegedly disabling impairments were also inconsistent with his subjective complaints (Tr. 26). While Plaintiff saw Dr. Memon on May 9, 2006 for sinusitis, hypertension, diabetes, and his spinal hemangioma (Tr. 901), he did not return to

Dr. Memon again until May 16, 2007, more than one year later (Tr. 902). *See id.* (Frequency of medical contacts and extensiveness of the attempts (medical or nonmedical) to obtain relief may be considered in evaluating credibility).

As the ALJ also found, Plaintiff's non-compliance with treatment also showed that his symptoms were not as severe as he alleged (Tr. 24, 26). In May 2006, he told Dr. Worthen that he stopped taking Cymbalta two weeks previously and "d[id] not feel that he need[ed] an antidepressant" (Tr. 770-71). Notes from the Northeastern Counseling Center from November 2004 to May 2007 showed that Plaintiff failed to show for approximately eleven appointments with Mr. Burnett without any explanation (Tr. 751, 755, 778, 871, 873, 890, 896). *See id.*

Plaintiff argues that the ALJ erred in considering his non-compliance with treatment and psychotherapy because "the fact he has missed a few appointments and expressed an interest in not taking more medications is not substantial evidence that would support a finding that his testimony was not credible" (Pl.'s Br. at 11). However, Plaintiff's noncompliance with psychotherapy was more substantial than he alleged. After his amended alleged onset date, he missed approximately eleven psychotherapy appointments without explanation (Tr. 751, 755, 778, 871, 873, 890, 896). The ALJ cited to a few of these instances as examples of noncompliance with therapy in his decision (Tr. 26). The Court also rejects this argument because Plaintiff's non-compliance was not the only factor the ALJ considered in finding that his subjective complaints were not fully credible (Tr. 21-26).

As the ALJ also found, Plaintiff's daily activities were inconsistent with his subjective complaints of disabling functional limitations (Tr. 25-26). He told Dr. Worthen in January 2005 that, during the day, he took care of his children, and at night, went to the grocery store

(Tr. 793-96). He told Dr. Worthen in October 2005 that his daily activities centered around caring for his children and stepdaughter. He also said that he collected baseball cards and enjoyed fishing (Tr. 788-89). He testified that, in 2005, he spent his time listening to music and watching two movies per day (Tr. 950). He testified that, on the Sunday before the hearing, he went to the park to supervise visitation of his children with their mother for one hour (Tr. 952-53). He testified that he then returned home and watched his children play (Tr. 953-54). He testified that, the day before the hearing, he spent most of the day at a friend's house playing cards and resting on the couch (Tr. 958-59). He testified that he had engaged in several hours of childcare. While he noted that his sister came over periodically to help, on a good day, he could have gotten by without her (Tr. 963-64). *See id.* (The nature of daily activities may be considered in evaluating credibility).

Plaintiff argues that the ALJ mischaracterized how consistently he performed his daily activities. More specifically, he argues that the ALJ ignored the fact that, while he could drive, he had to stop every 30 minutes to get out and move around. He also argues that the ALJ ignored the fact that his sister helped out with his children and failed to note that he needed help with and frequent rest breaks from performing household chores (Pl.'s Br. at 9-10). This is simply not so. The ALJ expressly acknowledged Plaintiff's testimony that he had to stop every 30 minutes and move around whenever he drove (Tr. 22). He also acknowledged that Plaintiff's sister assisted him with childcare and that he required assistance with household chores (Tr. 22).

As the ALJ also found, Plaintiff's demeanor at the hearing also detracted from his credibility (Tr. 26). While Plaintiff testified to 7-8/10 pain at the hearing, the ALJ did "not notice any pain behaviors, as he was calm, pleasant, intelligent, understanding[,] and responsive

-24-

to the questions and only periodically stood up because of alleged pain (Tr. 26, 935-79). *See*

*White v. Barnhart*, 287 F.3d 903, 909 (10th Cir. 2001) (observations of claimant at the hearing

can be considered); *Qualls*, 206 F.3d at 1373 ("[A]lthough an ALJ may not rely solely on his

personal observations to discredit a claimant's allegations, he may consider his personal

observations in his overall evaluation of the claimant's credibility." (citation omitted)).

Plaintiff argues that, in evaluating his credibility, the ALJ mischaracterized his hearing

testimony by saying he "testified to being capable of performing no less than the residual

functional capacity found in [his] decision and posed to the vocational expert" (Pl.'s Br. at 12;

Tr. 26). However, Plaintiff, in fact, testified at the hearing that he could sit for 20-30 minutes at

a time, stand for 15-20 minutes at a time, walk for about 30 minutes at a time, and lift a gallon of

milk (Tr. 942-44). Also, this was but one of several factors the ALJ considered in evaluating

Plaintiff's credibility (Tr. 21-26).

## (B)      **Evaluation of the Medical Source Opinions.**

The opinion of a treating physician on the nature and severity of a claimant's

impairments is entitled to controlling weight where it is well-supported by clinical findings and

consistent with other evidence in the record. If a treating physician's opinion is either not well-

supported by laboratory diagnostic techniques or not consistent with other substantial evidence,

i.e., not entitled to controlling weight, it is "still entitled to deference and must be weighed using

all of the factors provided in 20 C.F.R. [§ 404.1527]." *Watkins v. Barnhart*, 350 F.3d 1297,

1300-01 (10th Cir. 2003).[4] After considering these factors, an ALJ must give "good reasons" for

---

[4]Those factors are: (1) the length of the treatment relationship and frequency of the
(continued...)

the weight he ultimately assigns the opinion. If he rejects the opinion completely, he must then give "specific, legitimate reasons" for doing so. *See id.*

Plaintiff argues that the ALJ erred by improperly evaluating the opinions of his treating physicians (Pl.'s Br. at 12-16). Specifically, he argues that the ALJ erred by not considering the opinions of Drs. Hartle and Mitchell (Pl.'s Br. at 13-14). However, Dr. Hartle was a chiropractor, and as such, not an "acceptable medical source." Only acceptable medical sources can provide medical opinions and be considered "treating sources" as defined in 20 C.F.R. § 404.1502 whose medical opinions may be entitled to controlling weight. *See* 20 C.F.R. §§ 404.1527(a)(2), 404.1527(d); SSR 06-03p. Both Drs. Hartle and Mitchell rendered their opinions prior to Plaintiff's amended alleged onset date. Their opinions were therefore not relevant to the time period at issue. Moreover, the doctrine of *res judicata* applied to the opinions of Drs. Hartle and Mitchell as they were previously considered by another ALJ who found they were not entitled to controlling weight (Tr. 32-48). 20 C.F.R. § 404.957(c)(1) (ALJ can refuse to consider any one or more issues because "[t]he doctrine of *res judicata* applies in that we have made a previous determination or decision under this subpart about your rights on the same facts and on the same issue or issues, and this previous determination or decision has become final by either administrative or judicial action").

---

[4](...continued)
examination; (2) the nature and extent of the treatment relationship, including the treatment provided and the kind of examination or testing performed; (3) the degree to which the physician's opinion is supported by relevant evidence; (4) consistency between the opinion and the record as a whole; (5) whether or not the physician is a specialist in the area upon which the opinion is rendered; and (6) other factors brought to the ALJ's attention which tend to support or contradict the opinion. *See Watkins*, 350 F.3d at 1301.

Plaintiff further argues that the ALJ erred by failing to properly evaluate the opinions of Dr. Memon (Pl.'s Br. at 14-15). However, as the ALJ found, Dr. Memon's opinions were inconsistent with not only his own treatment notes, but with other objective medical evidence (Tr. 28). In May 2005, Dr. Memon found that Plaintiff had full strength in all of his extremities, 1/4 reflexes, and only slightly decreased sensation in his right arm and hand (Tr. 665). Dr. Memon's remaining treatment notes contained little, if any, objective findings (Tr. 663-64, 667-68, 670-71, 901-04, 908). In March 2006, he noted that Plaintiff's spinal pain was stable with Lortab (Tr. 901). In May 2007, he noted that Plaintiff's pain was only "occasionally worse" and his hemangioma was stable (Tr. 902). *See Castellano v. Sec'y of Health & Human Servs.*, 26 F.3d 1027, 1029 (10th Cir. 1994) (fact that the treating physician's office notes did not support his later-expressed opinion that claimant was totally disabled a reason to reject treating physician's opinion). In March 2005, Dr. Mitchell noted that Plaintiff "appear[ed] to be doing alright" (Tr. 632). In April 2005, Dr. Worthen noted that Plaintiff walked fluidly and did not seem to be in any pain (Tr. 772). In October 2005, Dr. Worthen noted that Plaintiff walked at a slow and easy pace (Tr. 788-89). And, in January 2006, a neck MRI study showed a "stable" hemangioma at T1, reversed lordosis, and only "mild" desiccation of one or two discs (Tr. 851). *See Eggleston v. Bowen*, 851 F.2d 1244, 1247 (10th Cir. 1988) (an ALJ may consider other medical opinion evidence in rejecting the opinion of a treating physician).

Dr. Memon's opinions were also inconsistent with Plaintiff's daily activities, which as discussed above included taking care of his children, collecting baseball cards, fishing, listening to music, watching movies, supervising visitation of his children by their mother, and playing cards (Tr. 788-89, 793-96, 950, 952-53, 958-59, 963-64). *See Castellano*, 26 F.3d at 1029

(claimant's daily activities a reason for rejecting treating physician's opinion that claimant was totally disabled). As the ALJ also found, Dr. Memon was not a mental health specialist, and therefore, his statements regarding Plaintiff's limitations due to mental impairments were entitled to less weight. 20 C.F.R. § 404.1527(d)(5) ("We generally give more weight to the opinion of a specialist about the medical issues related to his or her area of specialty than to the opinion of a source who is not a specialist"). With respect to Dr. Memon's statement that Plaintiff was unable to work (Tr. 663, 667-68), as the ALJ found (Tr. 28), medical source opinions that a claimant is "disabled" or "unable to work" are not controlling. *See* 20 C.F.R. § 404.1527(e)(1); SSR 96-5p. Such opinions are "not dispositive because final responsibility for determining the ultimate issue of disability is reserved to the [Commissioner]." *Castellano*, 26 F.3d at 1029.

Plaintiff argues that the ALJ could not rely on his daily activities in assigning Dr. Memon's opinions little weight as he "mischaracterized" them as "highly active" (Pl.'s Br. at 14). However, the ALJ did not mischaracterize his daily activities, and again, Plaintiff's daily activities were not the only reason the ALJ decided to give only little weight to Dr. Memon's opinions. Plaintiff argues that the ALJ also did not refer to any specific citations in his evaluation of Dr. Memon's opinions (Pl.'s Br. at 15). However, a "formalistic factor-by-factor recitation of the evidence" was not required. *See Qualls*, 206 F.3d at 1372.

Plaintiff argues that the ALJ erred by failing to properly evaluate the opinions of Dr. Worthen (Pl.'s Br. at 16). However, as the ALJ found, Dr. Worthen's opinions were inconsistent with his own treatment records as well as the other medical evidence (Tr. 28). As an initial matter, Dr. Worthen seemed so unsure of the marked limitations he assigned to Plaintiff that he qualified several of them with question marks written to the side (Tr. 824-26). In January

2005, he noted that Plaintiff did not appear to be in any distress and had logical, goal-directed, and fluent speech. He also appeared to have average intelligence (Tr. 793-96). In April 2005, Dr. Worthen found that he was alert and in no distress and found that his speech was logical and his mood was only "mildly" irritated (Tr. 772). In May 2005, he noted that Plaintiff did not feel that he needed an anti-depressant. He found that Plaintiff was alert and in no distress, only "somewhat irritable," and had logical speech and only "mildly" depressed mood (Tr. 770-71). In July 2005, Dr. Worthen noted that his mood was "fairly stable." He also noted that he got irritable only "occasionally" and had logical speech, neutral mood, and only "mild" anxiety (Tr. 765-66). In October 2005, he noted that Plaintiff was always calm and polite and had good long-term memory. He also "manage[d] his depression well most of the time" (Tr. 788-89). *See Castellano*, 26 F.3d at 1029. Dr. Worthen's opinions were also inconsistent with the findings of Mr. Burnett, who routinely found that he had unremarkable mental status examinations (Tr. 751-52, 754-56, 758, 760, 764-70, 773-78, 858-61, 863-66, 869-98). Plaintiff argues that the ALJ erred by "fail[ing] to cite to the evidence he fe[lt] did not support [Dr. Worthen's] assessment" (Pl.'s Br. at 15). This is simply not so. The ALJ specifically cited to exhibit B-12F on page 7 of his decision, one of Dr. Worthen's own reports (Tr. 788-89).

## ORDER

The Commissioner applied the correct legal standards, and his decision is supported by substantial evidence. Accordingly, the decision of the Commissioner is **AFFIRMED**. Judgment shall be entered in accordance with Fed. R. Civ. P. 58, consistent with the United States Supreme Court's decision in *Shalala v. Schaefer*, 509 U.S. 292, 296-302 (1993).

DATED this ___ day of _____, 2010.

2:09-cv-712 BSJ

4/27/10    BY THE COURT:

BRUCE S. JENKINS
United States District Judge

Approved as to form:

/s/Natalie Bolli-Jones          Date: April 20, 2010
NATALIE BOLLI-JONES
Attorney for Plaintiff